## METROPOLITAN LIFE INS. CO. v. SKOV et al.
### No. 940.

District Court, D. Oregon.
July 12, 1943.

See, also, 45 F.Supp. 140.

Robert R. Rankin, of Portland, Or., for plaintiff.

Leo Levenson, of Portland, Or., for Skov.

Robert Bradshaw, of Portland, Or., for Halley.

R. F. Dotsch, of Olympia, Wash., for Tamzan Snyder.

JAMES ALGER FEE, District Judge.

Plaintiff commenced this civil action to determine to which of the parties there should be paid the proceeds of certain insurance policies upon the life of George W. Snyder. One defendant, Tamzan Snyder, counterclaimed against the Metropolitan Life Insurance Company, the insurer, for certain payments theretofore made by the latter as permanent and total disability benefits. Based on a definitive pre-trial order, the matter was tried to the court without a jury.

The facts are little in dispute. George W. Snyder and Tamzan Snyder were married prior to the issuance of either policy in suit, and resided in the State of Washington at all times during the continuance of the relation.

On December 13, 1916, Metropolitan issued a 55-year endowment policy for $2,000 on the life of George W. Snyder in which Tamzan Snyder, the wife, was named as beneficiary. By rider thereto, it was provided that payment of premiums would be waived 'upon proper proof of permanent and total disability. It was also provided that the beneficiary could be changed by written notice to the company and surrender of the policy. There is no showing as to the source from which premiums on this policy were paid.

Metropolitan covered by group policy the lives of employees of Electric Bond & Share Company and certain of its subsidiaries, of which Northwestern Electric Company of Portland, Oregon, employer of Snyder, was one. This policy contained provisions for the waiver of payment of premiums and for the payment of certain monthly benefits to the insured in case of permanent and total disability, or to his guardian or beneficiary in case of mental incompetence. It was also provided that the insured could change the beneficiary by a written notice sent to the company and a surrender of the certificate issued thereunder.

On March 14, 1917, a certificate was issued to Snyder, who was employed at Vancouver, Washington, under this group policy by virtue of 'which he designated as beneficiary Tamzan, his wife. During all times thereafter, the premiums thereon were paid by the employer, part thereof being deducted from the wages or salary of Snyder by the company.

In June, 1930, Tamzan instituted proceedings for divorce against Snyder, alleging "* * * there are no property rights to be adjudicated in this action." Interlocutory decree entered July 11, 1930, Snyder not having appeared. On the motion of Snyder, this interlocutory order in favor of Tamzan became a final decree of divorce January 28, 1931. She testified in the action at bar that she delivered to him the endowment policy and the certificate under the group policy before the divorce became final and that on one occasion subsequent he visited her and asked her to consent to his receipt of the cash

surrender value of another policy not here in suit, on which most of the proceeds had been borrowed by them while the marriage was still in existence, which she did. Tamzan made no claim against Snyder nor Metropolitan until after the death of the former, when action was commenced against the latter in the State of Washington. The cash surrender value of the endowment policy at date of divorce was $10.22. There were no provisions for surrender for cash in the group policy.

Snyder thereafter married Mabel, now Mabel L. Skov, one of the defendants, on January 30, 1932, in the State of Washington, where they both resided until Mabel moved to Oregon, apparently with the idea of obtaining a divorce in 1938. Upon his application, Metropolitan substituted Mabel as the beneficiary of the endowment policy and of the certificate under the group policy.

Snyder became ill and was adjudged insane and committed to the Western State Hospital at Fort Steilacoom, Washington, on December 29, 1936. By consideration of the Superior Court of the State of Washington, Mabel L. Snyder was appointed guardian of his estate. Metropolitan, in accordance with the provisions of the policies, waived payment of premiums on the endowment policy from December 13, 1936, and on the certificate from February 16, 1937. Metropolitan, also claiming to act under the provisions of the group policy, paid to Mabel L. Snyder forty-one checks for the full amount that was due under the group policy each month between February 16, 1937, and August 16, 1940.

On January 25, 1939, by consideration of the Circuit Court of the State of Oregon for the County of Multnomah, Mabel was granted a final decree of divorce from Snyder. One Greeley was substituted as guardian of the estate of Snyder in the Superior Court of the State of Washington. Mabel married Carl L. Skov on July 19, 1939.

Snyder was found competent and was discharged by the committing court February 6, 1941, and the guardianship was dissolved, as of course. He demanded the return of the endowment policy and certificate from Mabel L. Skov, but she refused to return either. He then removed and resided near San Jose, California, with his sister, Josephine M. Halley, one of the defendants.

On February 10, 1941, a civil action was begun by Metropolitan in the United States District Court for the District of Oregon against Mabel L. Skov and Charles H. Greeley, and Josephine M. Halley was subsequently joined therein.

Snyder was rational and was in a sound and disposing state of mind from the time of his discharge to his death, according to uncontradicted testimony.

On March 11, 1941, he executed a change of beneficiary designation as to the endowment policy and the certificate from Mabel to Josephine M. Halley. These designations were forwarded to the Metropolitan March 13, 1941, and although received by it, no changes were made because of the fact that the policy and certificate were not delivered up in accordance with the terms of the policies. Delivery was impossible because Mabel was holding them.

On March 12, 1941, Snyder died and Josephine M. Halley was duly appointed executrix of his estate. By judgment rendered in the previous federal court action, the proceeds of the group policy up to that date were disposed of with respect to everyone, except Tamzan.

In this case, Metropolitan has deposited in court under the endowment policy $1,490.35. Under the group policy certificate it deposited $1,080. It claims these amounts constitute its total liability under the policy and certificate and seeks to be relieved by the deposit thereof.

At the outset, it should be noted that Tamzan Snyder, Jr., and Josephine M. Halley, as executrix of the Estate of George W. Snyder, do not present claims to the fund nor ask relief against any other party, although each will be bound by the judgment herein because a party to the proceedings. No further consideration will be accorded either, therefore. The controversy then lies between three women, two who divorced Snyder and the third, a sister with whom he lived for a few months. The cause may be thus decided without emotional elements, since none of the claimants has a strong moral position.

All parties tacitly agree that this court should determine the case under the law of the State of Washington as administered by a tribunal sitting in Oregon. While technical questions could be raised as to this, all parties have waived such

matters by inducing the court to use the legal basis above outlined. The pre-trial order raises no question as to this feature.[1]

 The system of community property prevails in the State of Washington. This outgrowth of the doctrine, which was derived so far as the states were concerned from certain countries with a Roman Catholic background,[2] took strong root in the pioneer settlements of the west and southwest. The necessity of economic protection of women and their intellectual equality with men was earliest recognized here and these factors influenced doctrinal development. The basic idea is simple. The community is in the nature of a partnership. The increase or acquisitions of property by either husband or wife after marriage are jointly owned by the community. Specifically, the fruit of labor or skill of the husband is held to be the joint creation of both.

Simple as this idea is, there was no uniformity in application in the countries where the doctrine reached its modern development. Likewise, the states here present respectively ramifications of application utterly different in pattern from each other. Basically, an entirely stable marriage relation is envisaged as a background. Because of the history of the concept, then, the courts have experienced grave difficulty in dealing with problems raised by the dissolution of the community by divorce and by the creation of a subsequent or multiple successive communities. Once created, public policy would seem to dictate that such a subsequent community should have the same protection as the prior community, in the present structure of society. But there is a tendency in the disposition of property to reward good and punish evil conduct, according to some standard present in the mind of the particular court.[3] These considerations illustrate the difficulty in arriving at a satisfactory solution where the exact point has not been ruled upon in the courts of the state under consideration, as is the situation here.

 In the courts of the State of Washington, the basic community doctrine is accepted. One fundamental feature of the law of that state is that the wife is vested with a present estate.[4] The husband is the manager of the community and may deal with the property thereof in its interest,[5] but may not give any property away, even to proper objects of his bounty, without the consent of the wife.[6] All earnings of the husband become part of the community property and are impressed with these limitations. Insurance policies as property fall within the rule above outlined. If a policy upon the life of the husband was acquired during the existence of the marriage relation, such a policy becomes community property.[7] If the wife is named as beneficiary thereof, she cannot be removed from this favored position without her consent.[8] If death of the husband occur and the wife is the beneficiary, the proceeds pass to her, not as community property but as part of her separate estate.[9] This latter rule, of course, was adopted to give to the wife in addition the same advantages with regard to insurance policies as accrue to her sisters in other states which do not have the community doctrine.

 In this case, both the policies in suit were acquired during the existence of

---

[1] Frank v. Giesy, 9 Cir., 117 F.2d 122, 126, 127.

[2] The chief sources of the doctrine as applied in the United States are Spanish and Mexican (see Spreckels v. Spreckels, 116 Cal. 339, 347, 48 P. 228, 36 L. R.A. 497, 58 Am.St.Rep. 170), although the influence of French law in the states which were part of the Louisiana Purchase is noticeable. Richardson v. De Giverville, 107 Mo. 422, 17 S.W. 974, 28 Am.St.Rep. 426; Picotte v. Cooley, 10 Mo. 312, 318. The system was established in the Territory of Washington by statute. Statutes of the Territory of Washington 1869, page 318.

[3] See Schramm v. Steele, 97 Wash. 309, 166 P. 634; Marston v. Rue, 92 Wash. 129, 159 P. 111; Johnston v. Johnston, 182 Wash. 573, 47 P.2d 1048.

[4] Holyoke v. Jacksoh, 3 Wash.T. 235, 3 P. 841; Occidental Life Ins. Co. v. Powers, 192 Wash. 475, 74 P.2d 27, 114 A.L.R. 531.

[5] See Sun Life Assurance Co. v. Outler, 172 Wash. 540, 20 P.2d 1110.

[6] Parker v. Parker, 121 Wash. 24, 207 P. 1062.

[7] Johnston v. Johnston, supra; Norman v. Levenhagen, 142 Wash. 372, 253 P. 113.

[8] Occidental Life Ins. Co. v. Powers, supra.

[9] Remington Revised Statutes of Washington § 7230-1.

the marriage relation of Snyder and Tamzan. There is no proof as to the source of the premium payments on the endowment policy. There was proof that the payments on the group certificate were made in part by contributions of the employer and in part by deductions from the salary or wages due Snyder during his employment. The date of acquisition fixes these policies as property of the community [10] of Snyder and Tamzan. It is not necessary to show that the payments were made from funds of the community under such circumstances, but all the payments on the group certificate were from community funds. If Snyder had died here, Tamzan would have taken all. He could not change the beneficiary of the policies without her consent while the marriage lasted.[11] He made a loan on the endowment policy, and whether this was with or without the consent of Tamzan it was valid and binding upon her, since it is assumed to be for the benefit of the community. The policy, under which the group certificate issued, contained a clause that in case of permanent and total disability due to mental incapacity, payments would be made by the Metropolitan to the beneficiary. This was a proper stipulation and was for the benefit of the community at that time existing. Snyder did not assign this policy to Tamzan, nor did he make a gift of it to her.

Under the law now considered, the community is dissolved by divorce. Unless the moving party brings the status of the property into the divorce proceeding, the decree of dissolution has no effect upon it and an estoppel is created. But there is authority to the effect that the other party to the proceeding may likewise be estopped.[12] If community property is not brought into the divorce proceeding, the husband and wife after decree hold as tenants in common.[13] The husband ceases to be the manager of the community and can thereafter take no action which affects the interest of the wife.[14]

The divorce instituted by Tamzan and brought to final decree on motion of Snyder terminated the community. Snyder did not surrender the policies, but kept paying premiums after the dissolution.

The law of the state is in an uncertain condition upon the interest which the former spouses have in a policy of insurance after divorce. The insurable interest of a wife in the life of her husband, existent at the initiation of the policy, gives validity to the contract.[15] Notwithstanding the destruction of the relationship, the policy retains its validity. But if the husband after divorce elects to continue payment of premiums upon a policy in which the wife has an interest, there are several possible solutions. Here the inaction of the first wife further complicates the situation.

But acquiescence and nonaction alone do not destroy property rights. The interest of Tamzan, whatever it may be, persists and has not been destroyed by waiver or estoppel. However, confronted with the facts of divorce and acquiescence, the Washington courts, although tenacious of the theory of vested interest, would probably not go further than this. The Louisiana solution under like circumstances is that the first wife retains a vested one-half interest in the proceeds of a community policy after divorce, even though a different beneficiary has been subsequently named, subject only to deduction in favor of the latter of premiums paid after the dissolution of the community.[16] In California, a different viewpoint obtains. In McBride v. McBride,[17] it was held that after divorce the parties hold as tenants in common and, where the husband substituted a beneficiary of a life insurance policy, the former wife on his death could recover that proportion of one-half of the proceeds of the policy as had been paid for by the funds of the first community.

The statute of Washington permits testamentary disposition of one-half of the property of the community by either husband or wife.[18] The Supreme Court of the state, however, repudiated the interpretation placed on that enactment by a

---

[10] See Johnston v. Johnston, supra.

[11] Occidental Life Ins. Co. v. Powers, supra.

[12] Ambrose v. Moore, 46 Wash. 463, 90 P. 588, 11 L.R.A.,N.S., 103.

[13] Ambrose v. Moore, supra.

[14] Barkley v. American Sav. Bank & Trust Co., 61 Wash. 415, 418, 112 P. 495.

[15] Humphrey v. Mutual Life Ins. Co., 86 Wash. 672, 151 P. 100.

[16] Berry v. Franklin State Bank & Trust Co., 186 La. 623, 173 So. 126.

[17] McBride v. McBride, 11 Cal.App.2d 521, 54 P.2d 480.

[18] Remington Revised Statutes of Washington § 1342.

federal court[19] to the effect that the similarity between bequest by will and disposition by designation of a beneficiary in a life insurance policy compelled the conclusion that the beneficiary thus named should receive one-half of the proceeds of the latter.[20] While theoretically this position might be subject to criticism because a plain analogy is disregarded, the construction of a state statute by its highest court is binding here, and is accepted as final.

When the reason for the firm insistence upon protection of the wife has passed by reason of the dissolution of the community, a court, which holds that property thereof undisposed of in divorce proceedings is held by the former spouses as tenants in common, might well hold that there was no distinction between insurance policies and other forms of property. The former wife still would have a vested interest in the proceeds founded upon one-half of the premiums paid out of community funds, provided the policy was in effect on the death of the former husband.

When this point is reached, it will be noted that the acceptance of the California solution exemplified in the McBride case, supra, is a logical step. The Washington courts probably would accept that solution. There are two further factors which strengthen this conclusion. In California, as in Washington, the wife has a present vested interest in community property.[21] Furthermore, in one case,[22] the Supreme Court of Washington has accepted a proportional method of dealing with proceeds of an insurance policy. In that case, the problem was as to how much of an estate consisting of a life insurance policy, part of the premiums of which were paid by community funds, descended to the former wife as heir and required payment by her of inheritance tax. It was decided that the proceeds of the policy were community property in proportion to the amount paid thereon out of community funds. The policy was the separate property of the husband at the time of the marriage, and he had paid part of the premiums thereof himself. Thus, there is ground furnished for distinction. But such a distinction is not persuasive in a situation where the community has been dissolved.

Although direct authority does not exist, the indications are that the Washington courts would hold that, since Tamzan's interest was a property right and she became a tenant in common, she is bound to accept that sum from the proceeds which her share of the premiums paid by the community bears to the whole amount of premiums paid. This gives her a negligible amount under the endowment policy, but a substantial amount under the group certificate.

Whatever conclusion might be arrived at upon this matter, the question of consent enters these determinations. The Washington law is that while the community is in existence and the wife is a beneficiary, a different beneficiary cannot be substituted for the wife without her consent. The corollary is true, of course, that substitution can be made with her consent. It must be held that after divorce her consent would still validate a change. No formalities for the giving of such consent seem necessary. If consent to substitution be given in fact, the insurance company need not be notified. The question is one to be solved on the evidence.

Here Tamzan gave her consent. This consent was not shown by the evidence to have been express, but was actual. The voluntary surrender of the certificate and the policy indicates such acquiescence. Her whole attitude in agreeing to the surrender of a policy not here in suit, the indication that she would not ask anything of a financial nature from Snyder, her complete quiescence and acquiescence in the change during his life, are further evidence of this attitude.

Then since the status of Tamzan is fixed, the court will consider the rights of Mabel. As to this second community of Snyder and Mabel, the insurance policies were his separate property. But since the system was the same, the labor of Snyder belonged to the community and, thus, community funds were invested in the certificate on the group policy. Although this factor does not give to Mabel

[19] Shields v. Barton, 7 Cir., 60 F.2d 351.

[20] Occidental Life Ins. Co. v. Powers, supra.

[21] The distinction suggested in the Powers case, supra, is not presently valid.

Britton v. Hammell, 4 Cal.2d 690, 52 P.2d 221. And see United States v. Malcolm, 282 U.S. 792, 51 S.Ct. 184, 75 L. Ed. 714.

[22] In re Coffey's Estate, 195 Wash. 379, 81 P.2d 283.

any legal standing, it should be given weight in appraising other factors. Mabel was named beneficiary and with Tamzan's consent, as has already been held. The court, however, holds that in the conversations whereby Mabel was told by Snyder to get the certificate and the endowment policy and that he expected her to build a house with the proceeds in the case of his death, he was doing nothing more than recognizing her right as beneficiary and was not making a gift.

The Metropolitan had a contract and it should be protected when it pays in accordance with the terms thereof. Public policy so demands. It is only in the exceptional case where the then wife has been beneficiary and another has been substituted without her consent therefor that the insurance company must stand on its guard. Tamzan has no right to recover from Metropolitan or Mabel as to payments so made.

The Metropolitan, upon the total and supposedly permanent disability of Snyder as the result of mental impairment, made the monthly payments to Mabel, who was the beneficiary. This was legal and binding upon all. The policy which was taken out so provided and Tamzan had consented that Mabel be the beneficiary. The funds of the second community had been invested in the policy. Metropolitan was bound to pay to the beneficiary then named, unless Tamzan had retained an interest beyond her half of the proceeds invested by her community. At all events, at the time Mabel was the person on whom the community law looked with favor. If it be necessary, the court would hold that such payments by Metropolitan were valid,[23] even to the extinction of Tamzan's interest and irrespective of whether she had consented to the change of beneficiary. The rights of Josephine W. Halley to this fund have already been settled in prior litigation binding on her.

When Mabel divorced Snyder and did not have the status of these policies fixed by decree, she became tenant in common of them only insofar as it is shown that funds from the community of which she was a member contributed to the result.[24] She is not shown to have made any payments on the endowment policy. All of the proceeds of the group policy in which she had any interest had been paid to her by the company. Upon divorce, then, she lost all her interest in the policies except that she was named as beneficiary. Under these circumstances, she had no right to insist that she be retained as beneficiary. She refused to surrender the policies. Snyder took all the necessary steps to have his sister named the beneficiary, except to surrender the policy and certificate. Her unlawful refusal to deliver the policy and certificate could not prevent Snyder from making the change.[25]

Where an insurance company, which has for its own protection established certain stipulations as conditions precedent to a change of beneficiary, deposits in court the amount of the policy in a suit between the first beneficiary and the substituted one, it may well be held to have waived performance, and the court will do equity between the opposing parties.[26] If it then appear that formal substitution was not made because of the failure of the first beneficiary to surrender up a policy, the court, if it find a clear interest of the insured to substitute another as beneficiary, will treat the substitution as accomplished.

It is expressly found that Snyder was competent at the time he directed the Metropolitan to make the substitution and that if the policy and the certificate had been surrendered then substitution would have been made.

The court, therefore, holds that the counterclaim of Tamzan Snyder as against Metropolitan be dismissed and that the plaintiff be discharged upon payment from the fund of attorney fees and costs. Tamzan Snyder will receive from the fund resulting from the group policy such an amount as bears a proportionate relationship to the proceeds of the certificate as one-half of the premiums paid by the community of which she and Snyder were

---

[23] The present statute of Washington may so require, but the court does not place decision on that ground. Washington Session Laws (1939) Ch. 97, pp. 266, 267; Remington Revised Statutes of Washington, §§ 7230-2 and 7230-5.

[24] See In re Coffey's Estate, supra.

[25] Jory v. Supreme Council A.L.H., 105 Cal. 20, 38 P. 524, 26 L.R.A. 733, 45 Am.St.Rep. 17; note 36, A.L.R. 771–775.

[26] Northern Life Insurance Co. v. Burkholder, 131 Or. 537, 550, 283 P. 739; Woodmen of the World v. Rutledge, 133 Cal. 640, 65 P. 1105; note IIIc, 78 A.L.R. pp. 975–980.

478

members bears to the total amount of premiums paid thereon. The same rule will be applied to the endowment policy, except that the loan will be deducted from the amount of premiums paid as of the date of her divorce. Her share of the proceeds will be based on one-half of this sum. The balance of the amount deposited on policy and certificate will be paid to Josephine M. Halley. The costs and attorney fees of Metropolitan will be deducted after the amounts are fixed to be paid to each claimant in proportion thereto.

Findings and judgment may be prepared.